IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

DAVID STEWART,                        )
                                      )
            Plaintiff,                )
                                      )
      v.                              )  Case No.
                                      )  08-5017-CV-SW-REL-SSA
MICHAEL J. ASTRUE, Commissioner       )
of Social Security,                   )
                                      )
            Defendant.                )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff David Stewart seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under the Social Security Act ("the Act"). Plaintiff argues that the ALJ did not properly assess plaintiff's residual functional capacity, the ALJ improperly relied on non-medical evidence, and the ALJ improperly evaluated plaintiff's credibility. I find that the substantial evidence in the record as a whole supports the ALJ's decision. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.   BACKGROUND

Plaintiff received disability benefits from 1999 until March 1, 2004. His benefits were stopped because he failed to return required paperwork in a timely fashion regarding an allegation that he had returned to work or engaged in work activity without reporting it to the agency. On June 9, 2005, plaintiff filed new

applications for disability insurance benefits and supplemental
security income benefits alleging an onset date of June 1, 2004 -
- the day after his final check.  Plaintiff's disability stems
from back pain, hip pain, diabetes mellitus, asthma, overactive
bladder, sleep apnea, fatigue, impaired memory and concentration,
depression, and mood swings.  Plaintiff's application was denied
on September 2, 2005.  On March 20, 2007, a hearing was held
before an Administrative Law Judge.  On May 7, 2007, the ALJ
found that plaintiff was not under a "disability" as defined in
the Act.  On January 12, 2008, the Appeals Council denied
plaintiff's request for review.  Therefore, the decision of the
ALJ stands as the final decision of the Commissioner.

## II.   *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for
judicial review of a "final decision" of the Commissioner.  The
standard for judicial review by the federal district court is
whether the decision of the Commissioner was supported by
substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales,
402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847,
850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th
Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir.
1996).  The determination of whether the Commissioner's decision
is supported by substantial evidence requires review of the

2

entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not

less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the
plaintiff establishes that he is unable to return to past
relevant work because of the disability, the burden of persuasion
shifts to the Commissioner to establish that there is some other
type of substantial gainful activity in the national economy that
the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857
(8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo.
2000).

The Social Security Administration has promulgated detailed
regulations setting out a sequential evaluation process to
determine whether a claimant is disabled.  These regulations are
codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step
sequential evaluation process used by the Commissioner is
outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful
activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a
combination of impairments which significantly limits his ability
to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment
in Appendix 1?

> Yes = disabled.
> No = go to next step.

4

4.   Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.   Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.  *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Marianne Lumpe, in addition to documentary evidence admitted at the hearing.

## A.   *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1980 through 2006, keeping in mind that he had been found disabled from 1999 through part of 2004:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1980 | $   594.22 | 1994 | $5,335.50 |
| 1981 | 0.00 | 1995 | 4,576.19 |
| 1982 | 0.00 | 1996 | 4,300.21 |
| 1983 | 474.25 | 1997 | 9,280.35 |
| 1984 | 1,387.99 | 1998 | 2,430.16 |
| 1985 | 2,103.08 | 1999 | 0.00 |

5

| 1986 | 0.00 | 2000 | 0.00 |
|------|------|------|------|
| 1987 | 2,682.03 | 2001 | 0.00 |
| 1988 | 4,565.14 | 2002 | 0.00 |
| 1989 | 96.80 | 2003 | 0.00 |
| 1990 | 3,015.51 | 2004 | 0.00 |
| 1991 | 204.76 | 2005 | 0.00 |
| 1992 | 542.13 | 2006 | 0.00 |
| 1993 | 5,311.79 | | |

(Tr. at 85, 91).

**Request for Review of Hearing Decision/Order**

In a request for review of the hearing decision, plaintiff wrote the following: "I feel he didn't review my file. The ALJ was cussing and upset @ staff for losing the file. He had to reschedule the hearing to the next day and I don't feel he had ample time to make an informed decision." (Tr. at 14).

**Transcript of March 19, 2007, hearing**

The administrative hearing was supposed to take place on March 19, 2007, but was not due to the file having been misplaced. The hearing was held the following day. Below is a complete transcript of the March 19, 2007, hearing.

> ALJ: Good morning. My name is Bill Horne. I'm an Administrative Law Judge with the Social Security Administration from Kansas City, Missouri. Sir, I've got bad news for you, and before I even tell you what the bad news is I'm going to apologize to you. As you know, your file came up -- was supposed to come up from Joplin to Kansas City, Missouri. We've been unable to locate your file which means that I cannot have a hearing if I don't

6

know what's inside your file. Now we've sent out an all
points bulletin to find that file, and I will reschedule
this. How far do you live from the office that you're in
now, sir?

CLMT: Twenty miles.

ALJ: Twenty miles. Steve, are you going to be with me
tomorrow?

HA: Yes, sir. I'll be with you next two days.

ALJ: Okay. Sir, if I scheduled this case, what time
for tomorrow -- would you be able to come back tomorrow?
Otherwise, we're going to have to put it back into
scheduling and it may be a month or two.

CLMT: Probably earlier the better.

ALJ: The earlier the better?

CLMT: Yeah, I'm up all night long. By afternoon I
can't walk, so --

ALJ: How about eight o'clock?

CLMT: That would be fine. That would be better yet.

ALJ: Okay. Well, then what we'll do is I will find
this file. We've got an all points bulletin out. Can you
make it in tomorrow at eight o'clock, sir, Steve?

HA: Yes, judge.

ALJ: Okay. Well, then what we'll do, sir, is we'll
reschedule this case for eight o'clock tomorrow. I
guarantee you I'll have the file by then, and then we can
have your hearing then. Okay, I apologize again, but
sometime[s] the best laid plans of men and mice sometime[s]
go astray, and this was the case on this particular case.
Okay?

CLMT: Yes, sir.

ALJ: I'll see you tomorrow at eight o'clock.

7

CLMT:   Thank you.

ALJ:   Okay.

(Tr. at 294-296).

The hearing commenced at 9:06 a.m. and ended at 9:08 a.m.

(Tr. at 294, 296).

**B.    *SUMMARY OF MEDICAL RECORDS***

On March 30, 2004, plaintiff saw Roger Schoenfeld, D.O., a

urologist, for recurrent urinary tract infection (Tr. at 169).

The record includes the following:

> He has had frequency, urgency, and nocturia.[1]  He also
> drinks one to two gallons of tea per day, two to three
> gallons of water however, his urine specific gravity today
> was 1.025, suggesting he probably does not drink more than a
> quart of fluid per day.
>
> He was seen initially by Annette Mayfield, my nurse
> clinician, who evaluated him until the point of the rectal
> exam, which he refused.  She made several attempts, tried to
> speak with him about it, but he still declined.  When I went
> in to see him, his wife immediately started telling me off
> about the fact that they had waited for an hour and a half
> to two hours and were not going to wait any longer.  I
> suggested that since there was inability to evaluate his
> prostate gland or his rectum by his choice, he probably
> needed to be seen by another physician anyway.
>
> * * * * *
>
> My impression would be, based on the information gathered,
> that he has a history of gross hematuria and urinary tract
> infection.  These patients need to be evaluated by IVP and
> cystoscopy.  He needs to be sent to another urologist for
> these two tests.

---

[1]The need to get up during the night to urinate.

8

I will not see him as a patient, unless perhaps he is by
himself and would be reasonable and submit to exams. I will
not see him with his wife in the clinic.

On April 16, 2004, plaintiff saw Harold Smart, D.O., a

family practitioner, complaining of back pain (Tr. at 185).

Plaintiff had peri-spinal muscle spasms in his mid thoracic area.

His lungs were clear to auscultation. Dr. Smart diagnosed

thoracic strain. He continued plaintiff on Tylox (narcotic) and

recommended an MRI. Dr. Smart refilled plaintiff's Soma (muscle

relaxer) on April 26, 2004, and his Lorcet Plus (narcotic) on May

5, 2004 (Tr. at 185).

On April 21, 2004, plaintiff had x-rays and an MRI of his

thoracic spine (Tr. at 189). He was found to have moderate

osteoarthritis in his mid thoracic spine with no acute bony

pathology. He had mild hemangioma change at T5 and T9, and

moderate change at T6 and L1 with no disk herniation. He had

mild arthritic change with thecal effacement at T9-T10, a normal

spinal cord, and no disk herniation.

On May 13, 2004, plaintiff saw John E. Goff, M.D., for an

examination at the request of Disability Determinations (Tr. at

170-173). The record reads in part as follows:

PRESENT COMPLAINTS/CAUSE OF DISABILITY:
The patient has multiple complaints which include back pain,
control of diabetes, irritable bowel problems, colon
problems and previous tumors (benign). He also complains of
shortness of breath and trouble urinating from prostate
problems. The patient is somewhat confined to home because

9

of all these particular issues.  He states that he is unable
to work because on any given day one of these problems would
prevent him from working.  He states that he is short of
breath with minimal exertion.  Also he frequently has
trouble urinating and that it takes him a great deal of time
to do that and that he is up every hour at night.  He has
back pain which is not relieved by the medication prescribed
by his local physician, Dr. Smart. As well, the irritable
bowel syndrome with diarrhea alternating with constipation
and severe abdominal cramps, treated by Drs. Smart and
Makdesi, is fairly poorly controlled.  Patient is only
partially cooperative with answering questions or undergoing
evaluation.

SOCIAL HISTORY:
He is married and has three children ages 19, 16, and 14.
He denies smoking and admits to occasional alcohol use
although he has not had any for the last few months.
Previously he drank two cases of beer daily.  He denies
illegal drug use.  He previously was a truck driver and a
day laborer and worked for his father who had a fencing
company. . . .

Plaintiff weighed 269 pounds.  He had a few scattered
wheezes throughout the lung fields.  His muscle mass was normal,
strength was normal, joint integrity was normal.  Plaintiff
refused to have a rectal exam and he refused range of motion
testing.  "Despite multiple consultations with patient, he
continued to refuse range of motion testing and the mini mental
exam included as a part of this examination.  He is aware that
processing of his application may not occur until these are
completed." (Tr. at 172).

On May 25, 2004, plaintiff saw Dr. Smart for a condition not
associated with his disability (Tr. at 183, 185).  On exam Dr.
Smart found some peri-spinal muscle spasms going down into the

10

thoracic area.  The lungs were clear to auscultation with good breath sounds to the bases.  He assessed, among other things, "depression issues."  He prescribed Wellbutrin, an antidepressant.

On May 27, 2004, plaintiff saw Mark Frogge, M.D., a urologist, due to urinary frequency and lower urinary track obstructive symptoms (Tr. at 184).  Dr. Frogge performed a digital rectal exam, urinalysis, and cystoscopy, and he reviewed a recent IVP[2] which was normal.  "His prostate appeared wide open.  He did have a tight bladder neck" but no lesions.  His assessment was "lower urinary tract symptoms, most likely due to poorly controlled diabetes.  I recommended evaluation by endocrinologist to see if we could get better control of his diabetes.  We are going to try him on Uroxatral[3] 10 mg a day instead of Flomax."[4]

On May 28, 2004, plaintiff saw Dr. Smart complaining of hot flashes since starting Wellbutrin (Tr. at 183).  His lungs were clear to auscultation.  Dr. Smart told plaintiff to stop taking Wellbutrin and referred him to Dr. Bratcher for uncontrolled

---

[2]Intravenous pyelography (Tr. at 186).

[3]Relaxes the muscles in the prostate and bladder neck, making it easier to urinate.

[4]Relaxes the muscles in the prostate and bladder neck, making it easier to urinate.

diabetes.

June 1, 2004, is plaintiff's alleged onset date.

On June 8, 2004, Dr. Smart refilled plaintiff's Lortab Plus (narcotic) (Tr. at 183).

On June 15, 2004, plaintiff saw Dr. Smart due to knee pain (Tr. at 182). Plaintiff had full range of motion in his knee, and all other tests were normal. His lungs were clear to auscultation. He continued to have peri-spinal muscle spasms in the cervical and upper thoracic area. Dr. Smart diagnosed chronic osteoarthritis, left knee strain, and diabetes. Dr. Smart refilled plaintiff's Soma on August 13 2004; he refilled plaintiff's Lortab Plus (narcotic) on July 7, 2004; August 17, 2004; September 10, 2004; and September 30, 2004; he prescribed Tylox #3 (narcotic) on August 4, 2004; and he prescribed Uroxatral[5] on September 13, 2004 (Tr. at 182).

On October 20, 2004, plaintiff saw Dr. Smart for medication refills (Tr. at 181). His lungs were clear to auscultation. He was assessed with cervical and thoracic strain and diabetes. He prescribed Flomax, took plaintiff off Uroxatral, increased plaintiff's Fortamet,[6] and refilled his Soma (muscle relaxer) and Lorcet Plus (narcotic).

_____

[5]Relaxes the muscles in the prostate and bladder neck, making it easier to urinate.

[6]Treats diabetes.

On November 11, 2004, plaintiff saw Dr. Smart complaining of lower back pain (Tr. at 181). Plaintiff's lungs were clear to auscultation. "He continues to have this mid thoracic somatic dysfunction."[7] Dr. Smart diagnosed somatic dysfunction and osteoarthritis. He refilled plaintiff's Soma (muscle relaxer), Lortab Plus (narcotic) and Duratuss.[8]

On December 6, 2004, Dr. Smart refilled plaintiff's Lortab Plus (narcotic) (Tr. at 181).

On January 19, 2005, plaintiff saw Dr. Smart due to upper and middle back pain (Tr. at 178). On exam his lungs were clear to auscultation. Plaintiff had some peri-spinal muscle spasms in the upper thoracic and lower cervical areas. Dr. Smart assessed cervical and thoracic strain. Dr. Smart refilled plaintiff's Lorcet (narcotic) and Soma (muscle relaxer).

---

[7]Somatic dysfunction refers to impaired or altered function of related components of the somatic (body framework) system: skeletal, arthrodial, and myofascial structures, and related vascular, lymphatic and neural elements.

[8]An expectorant to loosen phlegm.

On January 24, 2005, plaintiff had an A1C[9] test which measured 11.0, indicating his diabetes was not controlled (Tr. at 179).  Normal is 4.6 to 6.2.

On February 2, 2005, plaintiff saw Dr. Smart for his diabetes (Tr. at 178).  Plaintiff's blood sugar had been in the 200's.  "We discussed his eating habits and how he is not eating on a regular basis." Plaintiff's lungs were clear to auscultation.  Dr. Smart diagnosed cervical and thoracic strain with osteoarthritis and diabetes.  He started plaintiff on insulin injections.  There is a hand-written addendum to the note which says, "Pt. called, states glucose ↑ 380's and hungry all the time, he d/c [discontinued] insulin now glucose normal."

On February 21, 2005, Dr. Smart called in a prescription for Lorcet (narcotic) (Tr. at 178).

On February 24, 2005, plaintiff saw Dr. Smart for a "generalized complaint of back pain" and to follow up on his insulin (Tr. at 176).  Plaintiff reported that his blood sugar was "staying in the low 100s".  On exam plaintiff had some pari-

_____

[9]The red blood cells that circulate in the body live for about three months before they die. When sugar sticks to these cells, it provides an idea of how much sugar has been around for the preceding three months. In poorly controlled diabetes, it is 8.0% or above, and in well controlled patients it is less than 7.0%. The benefits of measuring A1c is that is gives a more reasonable view of what is happening over the course of time (3 months), and the value does not bounce as much as finger stick blood sugar measurements. A1c is used as a standard tool to determine blood sugar control in patients known to have diabetes.

14

spinal muscle spasms going into the thoracic area. His lungs were clear to auscultation. Dr. Smart assessed chronic cervical and thoracic strain, diabetes, and history of hypertension (his blood pressure on this day was 128/78). He recommended physical therapy and prescribed Neurontin (used to treat seizures and pain).

On March 15, 2005, plaintiff saw Dr. Smart for symptoms of a sinus infection (Tr. at 176). His blood pressure was 104/68. His lungs were clear to auscultation. Dr. Smart gave plaintiff an antibiotic.

On March 17, 2005, Dr. Smart called in a prescription for Lorcet Plus, a narcotic (Tr. at 176).

On April 5, 2005, Dr. Smart called in a prescription for Soma, a muscle relaxer (Tr. at 176). It was refilled on June 1, 2005 (Tr. at 176).

On August 5, 2005, plaintiff saw Kevin Whisman, Psy.D., at the request of Disability Determinations (Tr. at 232-236). Dr. Whisman's report reads in part as follows:

> GENERAL OBSERVATIONS:
> . . . He walked willfully with the examiner into the testing room. No difficulty with gait was observed. He was dressed in casual clothing and hygiene was appropriate. Eye contact was adequately maintained. Mr. Stewart . . . appeared to have few difficulties relating with the examiner. He was quite engaging and smiled frequently. . . .

15

PRESENTING PROBLEM AND CHIEF COMPLAINT:
Mr. Stewart related he had previously been receiving Social
Security benefits since 2002.  However, he stated, "I didn't
fill out some papers and they took me off of it. I was
trying to go without it and I just can't.  I have too many
physical problems."  With this, the examiner mentioned the
file review and the history of having polyps removed.  Mr.
Stewart corrected the examiner and reported the polyps were
"tumors the size of baseballs...the biggest the doctor had
ever seen."  He then complained of "sleep apnea, lower back
pain, pain on the left side of my leg...they can't get me
straightened out.  They can't operate on it because it is
right behind my heart and lungs.  I went to four doctors and
they told me I was shafted.  They are not willing to take
the chance.  Two people have died from the surgery."  Mr.
Stewart related the pain "paralyzes me...it starts with a
surge, like someone stuck you with a knife and you just
drop.  You go to your knees.  It takes twenty minutes to get
any feeling."  When asked about the alleged "personality
disorder," Mr. Stewart stated, "I don't like to
read...people get mad at me because I don't like to read.  I
am smart though.  I could probably do your job."  He
claimed, "I used to get mad a lot."

RELEVANT BACKGROUND INFORMATION
. . . According to the client, the highest grade he
completed with the ninth.  He discontinued his education
because "I just don't like to read.  I can read excellent,
but just don't like it."  Mr. Stewart has not attempted any
further education to include a general education diploma.
While in elementary and secondary school, the client
reported receiving special education services.  He stated,
"they put me in there for a money thing...I tested pretty
high on the IQ test." . . .

According to the client, he first began employment around a
young age.  Mr. Stewart claimed, "I first drove a hay truck
when I was two years old." . . .  Mr. Stewart reported he
would leave employment due to physical problems, stating, "I
just couldn't get up and go."  He admitted having
difficulties interacting with others at work and, as a
result, received anger management training. . . .  He then
attributed interpersonal difficulties to his blood sugar
levels and the severity of his "pain."  Mr. Stewart related
he was "probably fired...I don't know, it has been too
long."  He believed others would describe his work

16

performance as "excellent."  Mr. Stewart expressed a desire
to be employed; however, he was unable to identify an
occupation he would like to pursue.

. . . According to the client, he is not presently using
alcohol.  The client related a history of excessive alcohol
consumption including "two to three cases per day." . . .

The client has been arrested for "my wife's mouth...a lot of
things are off the record...just being an ornery kid." . . .

MENTAL STATUS EXAM:
Mr. Stewart appeared to be experiencing no acute emotional
distress as there was little evidence of depression or
anxiety.  Affective responses were reactive, congruent, and
within normal limits.  The client denied suicidal ideation.
He was not actively psychotic and did not relate a history
of thought disorder to include visual or auditory
hallucinations.  There were no bizarre or unusual gestures
or mannerisms.  Upon introducing the Mental Status Exam, Mr.
Stewart initially refused.  He stated, "I don't like it...it
gives me a headache."  However, with encouragement, the
client completed all tasks.  Mr. Stewart's ability to attend
to a task does not appear to be impaired.  His performance
on the Digit Repetition Test was within normal limits as he
successfully recited a strand of five digits.  Mental
control was adequate as [he] correctly spelled "world"
backward.  Math functions were intact, including the ability
to perform complex problems.  Overall, he was oriented to
time, place, person, and purpose.  The client demonstrated
excellent new learning ability as he was able to recall all
three unrelated words after a time delay.  He was successful
at following a simple, three-step command.  Mr. Stewart's
remote memory was not impaired as demonstrated by his
ability to answer questions related to past historical and
personal events.  His speech did not appear to be distorted,
did not include interruptions of speech melody, and he did
not display impairment in the production or comprehension of
spoken language.  Intellectually, it appears Mr. Stewart is
functioning in the average range as measured by his
performance on tasks such as proverb interpretation,
defining similarities, and answering questions requiring a
fund of information.

17

DIAGNOSTIC IMPRESSIONS
During the clinical interview, Mr. Stewart alleged a history
of "personality disorder." However, he was unable to
describe this and simply stated, "I don't like to read." It
appears the personality disruption might be attributed to
difficulties with authority. Mr. Stewart related well with
the examiner until demands were placed upon him (i.e., tasks
of the mental status). There was evidence within the
history of interpersonal difficulties within the educational
and occupational environments. Mr. Stewart was initially
quite engaging in spontaneous conversations. However, there
was evidence of grandiosity in the stories he related.
Therefore, it does appear a personality disturbance would be
the primary diagnosis. Yet one specific disorder could not
be fully diagnosed based upon the criteria. His physical
condition is likely to be exacerbated by the personality
disruption and may approach a somatization disorder. This
is consistent with one of Dr. Smart's diagnostic
impressions.[10]

| | |
|---|---|
| Axis I | Pain Disorder Associated with Both Psychological Factors and a General Medical Condition Rule Out Somatization Disorder |
| Axis II | Personality Disorder Not Otherwise Specified with Narcissistic and Antisocial features |
| Axis III | Diabetes, back pain per client report |
| Axis IV | Occupational problems |
| Axis V | GAF 51[11] Current |

---

[10]I question whether Dr. Whisman's note regarding Dr.
Smart's diagnosis is actually consistent with Dr. Whisman's
belief that defendant may be suffering from a somatization
disorder. Somatization disorder, in mental health, is a chronic
condition in which there are numerous physical complaints which
can last for years and result in substantial impairment. The
physical symptoms are caused by psychological problems, and no
underlying physical problem can be identified. Dr. Smart, a
doctor of osteopathy, diagnosed somatic dysfunction, which refers
to impaired or altered function of related components of the
somatic (body framework) system: skeletal, arthrodial, and
myofascial structures, and related vascular, lymphatic and neural
elements.

[11]A global assessment of functioning of 51 to 60 means
moderate symptoms (e.g., flat affect and circumstantial speech,
occasional panic attacks) or moderate difficulty in social,

Case 3:08-cv-05017-REL   Document 21   Filed 03/04/09   Page 18 of 44

SUMMARY AND RECOMMENDATIONS:
                    * * * * *
The specific referral questions are addressed below:

1.   What is the client's MAXIMUM remaining ability to
     understand and remember instructions?

     Mr. Stewart arrived on time for the appointment and
     demonstrated understanding of the purpose for the
     evaluation.  He demonstrated an ability to relate with
     the examiner and answered questions appropriately.  The
     mental status did not reflect any difficulties with
     memory or comprehension.  He successfully followed a
     simple, three-step command.  The client's maximum
     remaining ability to understand and remember
     instructions would likely be in most all tasks.

2.   What is the client's MAXIMUM remaining ability to
     sustain concentration and persistence in tasks?

     Mr. Stewart performed extremely well on tasks of the
     mental status exam.  He was successful at responding to
     examiner prompts and his speech was not derailed or
     circumstantial.  The client did not appear to be
     distracted by external events.  Based upon the clinical
     presentation, his maximum remaining ability to sustain
     concentration and persistence is believed to be
     adequate in most all tasks.

3.   What is the client's MAXIMUM remaining ability to
     interact socially and adapt to his environment?

     The client's personality functioning would likely
     impede his effectiveness at interacting socially on a
     consistent basis.  The mannerisms observed throughout
     assessment would likely create difficulties with an
     authority figure.  It is suspected the client's maximum
     remaining ability to interact socially and adapt to his
     environment would be within a socially restricted
     environment with limited supervisory expectations.

4.   Is the client capable of managing his funds?

occupational, or school functioning (e.g., few friends, conflicts
with peers or co-workers).

19

Mr. Stewart demonstrated intact math functions on the mental status exam. Therefore, it appears he would be capable of managing his financial matters in an independent and responsible manner.

(Tr. at 232-235).

On August 17, 2005, plaintiff saw William S. Hughes, D.O., for a disability evaluation at the request of Disability Determinations (Tr. at 237-239). Dr. Hughes's report reads in part as follows:

. . . In reviewing x-rays of the thoracic spine, it is felt that there are anterior osteophytes upon the vertebral bodies with moderate osteoarthritis of the mid-thoracic spine and the lateral aspect of vertebral bodies. X-rays revealed the above and Magnetic Resonance Imaging of the thoracic spine revealed no focal disk herniation, with arthritic changes around T9-T10. There is no evidence of spinal cord disruption and no disk herniation is apparent.

He is a Type II diabetic of approximately three years duration. He is currently on Glucophage and Actos. He reports his sugars average about 120. He denies known complications of the diabetes. . . .

He also has a birth defect of the right hip and it seems as though he may have a little bit of a problem with right hip dysplasia though I do not have an exact diagnosis.

He is agitated with his pain and gets mean. He has social lability and moodiness and irritability. . . .

He states as far as his respiratory problems are concerned he has dyspnea [shortness of breath], and if he is able to walk slow he does not have significant dyspnea, but over the course of stepping up to a brisk pace he will have exacerbation of his dyspnea. The dyspnea occurs on a daily basis.

Additionally, at the end of this information, he states that he will occasionally lose sensation of the left leg and has

20

subtle paresthesias[12] of the left leg.  He states the pain lasts sometimes up to 24 hours before it resolves.

* * * * *

SOCIAL HISTORY:  There is no history of nicotine or alcohol use. . . .

PHYSICAL EXAMINATION:
VITAL SIGNS:  Height is 5'10 1/4"; weight 263 pounds, pulse 64, respiratory rate 20 and BP 126/78.

* * * * *

LUNGS:  Are clear to auscultation bilaterally without wheezing, rales or rhonchi or use of accessory muscles. . . .

MUSCULOSKELETAL:  He is tender in the region of T3 through the entire thoracic spine down through the lumbar spine, midline.  There are moderate degrees of perithoracic spasm. . . .  Range of motion is full and complete in the shoulders, elbows, wrists and knees. . . .  [T]he patient was unable to forward bend on today's exam.  Straight-leg raising is 90 degrees on the right and 60 degrees on the left.  In the seated position it is 90 degrees on the right and 70 degrees on the left.  No lower extremity muscle weakness is elicited.  He is able to squat on the right knee.  He walks with a limp favoring the right lower extremity.  He has difficulty in rising from the squatting position and I did have to help him do this. . . .

IMPRESSIONS:
a)   Chronic low back pain.
b)   History of colon polyps.
c)   Type II diabetes mellitus.
d)   History of sleep apnea.
e)   History of gastric ulcer resection.
f)   Osteoarthritis of the thoracic spine.

_____

[12]Paresthesia refers to a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body. The sensation, which happens without warning, is usually painless and described as tingling or numbness, skin crawling, or itching.

21

Dr. Hughes found that plaintiff's cervical spine lateral flexion (bending head side to side) was normal, flexion (bending head forward) was 50° (normal is 60°), extension was 60° (normal is 75°), and left and right rotation (turning head side to side) was 60° (normal is 80°) (Tr. at 241).

On August 31, 2005, Kenneth Burstin, Ph.D., completed a Psychiatric Review Technique (Tr. at 245-258). He found that plaintiff suffers from somatoform disorder and a personality disorder which cause mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. In support of his findings, Dr. Burstin wrote,

> There is no recent evidence regarding mental impairment. TP [treating physician], Dr. Smart, notes no evidence of mental impairment in recent MER [medical records] to 6/05. Claimant is not receiving mental health treatment, and is not prescribed psychotropic meds.
>
> At CE [consultative exam] claimant was engaging and smiled easily. He was not in emotional distress, and there was little evidence of depression or anxiety. Claimant was cognitively intact on MSE [mental status exam], including memory, and he was estimated to be of average intelligence. MSO [mental status opinion] was clearly based on cl's self-report as, as noted above, he did not have severe limitations in relating to the examiner.
>
> C&C [credibility]: Partial, in that MDIs [medically diagnosed impairment] established. However, leaving aside issues of tx [treatment]/duration, objective evidence does not support disabling impairment.

22

Conclusion:  Arguable as NS [not significant], based on observations, but following MSO [mental status opinion] as written, severe impairments which do not M/E [meet or exceed] listing-level severity.

That same day, Dr. Burstin completed a Mental Residual Functional Capacity Assessment (Tr. at 259-261).  He found that plaintiff is not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to understand and remember detailed instructions

- The ability to carry out very short and simple instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to ask simple questions or request assistance

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

23

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that plaintiff is moderately limited in the following:

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

(Tr. at 259-260).

**C.    *SUMMARY OF TESTIMONY***

During the March 20, 2007, hearing, plaintiff testified; and Marianne Lumpe, a vocational expert, testified at the request of the ALJ.  At the beginning of the hearing, the ALJ reminded plaintiff that someone had seen him building a pipe fence while he was receiving disability benefits and turned him in to the Social Security Administration (Tr. at 300).  His benefits were ceased on March 1, 2004, after plaintiff either failed to return requested paperwork or filled it out incorrectly (Tr. at 300).  Plaintiff filed another application for disability benefits (Tr. at 300).  The ALJ advised plaintiff that he had an opportunity to

24

be represented by an attorney (Tr. at 300). The ALJ outlined the reasons why it is better to have an attorney (Tr. at 301). Plaintiff said he did not need an attorney (Tr. at 301).

**1. Plaintiff's testimony.**

At the time of the administrative hearing, plaintiff was 43 years of age and is currently 45 (Tr. at 299). He went to school through eighth grade (Tr. at 299). He can read and write, but he does not like to; and he can do simple math (Tr. at 299-300). Plaintiff testified that he was six feet tall and weighed 300 pounds (Tr. at 300). Plaintiff was married and was living in a one-story house (Tr. at 313). He did no cooking, sweeping, mopping, dusting, housework, or lawn work (Tr. at 314). Plaintiff has one daughter living at home and two grown sons, one of whom is in college and comes home on the weekends (Tr. at 314). Plaintiff can drive three to five miles (Tr. at 314).

Plaintiff received disability benefits from May 26, 1999, through March 1, 2004 (Tr. at 300, 302). Plaintiff was receiving disability benefits due to his back and legs (Tr. at 302). Plaintiff injured his back in 1984 and again in the mid 1980's (Tr. at 303). Plaintiff said he was run over on his lower back the first time and then was run over again by a pickup truck the second time over his chest (Tr. at 303). Plaintiff did not have surgery either time (Tr. at 304). "They said it would cost me

25

$50,000 to, and with the diabetes, they're afraid to open me up"
(Tr. at 304).  Plaintiff takes about 200 Hydrocodone per month,
100 Soma per month, and 100 Aleve per month (Tr. at 305, 306).
Plaintiff has been taking Hydrocodone for at least 20 years (Tr.
at 305).  He testified that when he is off the Hydrocodone he is
an alcoholic (Tr. at 314).  "I'll drink a case of beer a day and
a fifth of whiskey." (Tr. at 315).  He testified he drinks this
much every day if he is taken off his pain pills (Tr. at 315).
His doctors tried to take him off the pain pills twice during the
last year, and he resumed drinking (Tr. at 315).

Plaintiff had been receiving injections in his back which
work sometimes (Tr. at 306).  He was asked if the shots get rid
of the pain, and he said, "Yeah.  But not instantly.  It takes
it.  It takes it like 30 minutes to an hour to work." (Tr. at
306).  Plaintiff went through physical therapy, but his back
would pop and he would "just about pass out" and "get paralyzed"
(Tr. at 307).

Plaintiff was diagnosed with diabetes in 2004 (Tr. at 307).
He started with oral medication and the previous year his doctor
added insulin injections (Tr. at 307).  Plaintiff measures his
glucose multiple times a day (Tr. at 308).  His measurements
range from 85 to 500 (Tr. at 309).  His glucose is uncontrolled
due to the pain in plaintiff's back (Tr. at 309).  Plaintiff

26

wears glasses and his feet swell, but he is not sure if those symptoms are caused by his uncontrolled diabetes (Tr. at 309).

Plaintiff's whole left leg "goes dead" (Tr. at 310). His hip gets numb and he cannot stand (Tr. at 310). He has had the numb-hip problem since 1984, but it has gotten worse over the past few years (Tr. at 310). Plaintiff has had breathing problems "like asthma" his entire life (Tr. at 310). He takes Guaifenesin[13] and previously used inhalers (Tr. at 311).

Plaintiff suffers intense pain in his abdomen due to an enlarged prostate (Tr. at 311). He has this pain "until [he] goes to the bathroom." (Tr. at 311-312). Plaintiff said he suffers from depression and anger, but is not on any medication because it made him violent (Tr. at 312-313). He had not been hospitalized due to any mental health issue between his alleged onset date and the date of the hearing (Tr. at 313).

Plaintiff testified that he never sleeps:

Q.   Do you have any problems sleeping, sir?

A.   I never sleep.

Q.   You've got to sleep sometime.

A.   I never sleep, sir.  You can come to my house and -- (Tr. at 315).

---

[13]Guaifenesin is an expectorant used to break up congestion and mucous to ease breathing.  Guaifenesin thins mucous, increases lubrication of the respiratory tract (lungs, nose, and throat), and increases the removal of mucous.

27

When asked what he does all day, he said, "Complain." (Tr. at 315). When asked how he passes the time during the day, plaintiff said, "I hate reading. I hate reading. I don't do a whole lot, I really don't. I've -- I've had surgery for my breathing. Did they tell you that I had surgery on my throat and nose for my breathing?" (Tr. at 316). The ALJ noted that there were no records of that surgery in the file (Tr. at 316). Plaintiff said his doctor "took out my throat" (Tr. at 316).

Plaintiff was asked about the information provided to SSA about his building a fence (Tr. at 317). He said:

> I can tell you what that was. My friend was going through a divorce and his wife was mad at him and that's where we got that one. She turned me in instead of him.

(Tr. at 317).

Plaintiff testified that he could sit for about 25 minutes, stand for "not very long" (although he failed to elaborate when questioned about how long that would actually be), he could not lift even five pounds, he can walk a half a block but he is in a lot of pain (Tr. at 317-318). When asked if there was anything he wanted to add about why he could not work, he said, "I get frustrated real easy. I don't like to read and write, you know, and I don't know why it's not all on the first record. You know, I don't know why it's went this far, Your Honor. My family's

28

having a tough time with it.  My wife's the only income we have.
You know, it's terrible." (Tr. at 318).

**2.  Vocational expert testimony.**

Vocational expert Marianne Lumpe testified at the request of
the Administrative Law Judge.  The vocational expert testified
that plaintiff performed substantial gainful activity only one
year of his life, in 1997 when he earned $9,280 (Tr. at 321).
His job performing garbage pickup that year was heavy exertion,
and plaintiff cannot return to that past relevant work (Tr. at
321-322).

The first hypothetical involved a person who could perform
sedentary work with the following exceptions:  lifting no more
than ten pounds occasionally and less than ten pounds frequently;
simple, routine, repetitive jobs as stress free as possible;
limited contact with coworkers and a consuming public; an
environment relatively free of smoke, dust, and pollutants;
controlled humidity with no extremes of hot or cold; a sit/stand
option where he can sit for 35 minutes and stand for 25 minutes
each hour; may occasionally bend; may never crawl, kneel, crouch,
squat, or climb ladders, scaffolds, or ropes; and must work on a
level surface with no use of foot controls (Tr. at 322-323).  The
vocational expert testified that such a person could be an
optical goods processor with 1,160 such jobs in Missouri and

68,000 in the United States; a surveillance system monitor with 2,000 jobs in Missouri, and 100,000 in the United States; or a packager ampoule sealer[14] with 1,000 in Missouri and 50,000 in the United States (Tr. at 323-324).

## V.   *FINDINGS OF THE ALJ*

Administrative Law Judge William Horne entered his opinion on May 7, 2007 (Tr. at 19-27).

Step one.  Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 21).

Step two.  Plaintiff suffers from the following severe impairments:  disorder of the back, diabetes mellitus, and an affective disorder (Tr. at 21).  There is no evidence that plaintiff's overactive bladder results in significant limitations; therefore, it is not severe (Tr. at 21). Plaintiff's alleged asthma and alleged sleep apnea are not medically determinable impairments (Tr. at 21-22).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 22).

Step four.  Plaintiff's allegations as to the severity and limiting affect of his impairments are not credible.  He retains the residual functional capacity to perform the full range of

_____

[14]According to the Dictionary of Occupational Titles, an ampoule sealer seals ampoules filled with liquid drug products, preparatory to packaging.

30

sedentary work with the following exceptions:  lifting no more than ten pounds occasionally and less than ten pounds frequently; only work that is simple, routine, repetitive and as stress-free as possible; limited contact with co-workers and the general public; work in a clean environment, relatively free of smoke, dust, and other pollutants; work in an area of controlled humidity with no extremes of hot or cold; must have a sit/stand option where he can sit every hour for 35 minutes and stand for 25 minutes; occasionally bend but no crawling, kneeling, crouching, or squatting; no climbing of ladders, scaffolds or ropes; and work only on a smooth level surface on a job with no requirements for foot controls (Tr. at 22).  With this residual functional capacity, plaintiff cannot return to his past relevant work (Tr. at 25).

Step five.  Plaintiff can adjust to other work in the economy such as optical goods processor, with 1,160 in the state and 68,000 in the country; surveillance system monitor, with 2,000 in the state and 100,000 in the country; or packager, ampoule sealer with 1,000 positions in the state and 50,000 in the country (Tr. at 25-26).

## VI.  *CREDIBILITY OF PLAINTIFF*

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

31

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. <u>Rautio v. Bowen</u>, 862 F.2d 176, 178 (8th Cir. 1988); <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. <u>Gray v. Apfel</u>, 192 F.3d 799, 803 (8th Cir. 1999); <u>McClees v. Shalala</u>, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. <u>Hall v. Chater</u>, 62 F.3d 220, 223 (8th Cir. 1995); <u>Robinson v. Sullivan</u>, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. <u>Robinson v. Sullivan</u>, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's

32

daily activities; the duration, frequency, and intensity of the
symptoms; precipitating and aggravating factors; dosage,
effectiveness, and side effects of medication; and functional
restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.
1984).  Social Security Ruling 96-7p encompasses the same factors
as those enumerated in the Polaski opinion, and additionally
states that the following factors should be considered:
Treatment, other than medication, the individual receives or has
received for relief of pain or other symptoms; and any measures
other than treatment the individual uses or has used to relieve
pain or other symptoms (e.g., lying flat on his or her back,
standing for 15 to 20 minutes every hour, or sleeping on a
board).

    The specific reasons listed by the ALJ for discrediting
plaintiff's subjective complaints of disability are as follows:

    He was able to drive short distances such as three to five
    miles.  The claimant reported a history of heavy drinking
    but stated he has not drank in a year.

    . . .  [T]he claimant's statements concerning the intensity,
    persistence and limiting effects of these symptoms are not
    entirely credible.

    . . .  The undersigned notes that the claimant was
    uncooperative with a consultative exam on May 13, 2004.
    Although he complained of back pain, he would not attempt
    range of motion testing as requested.  He complained of
    shortness of breath with minimal exertion.  However, Dr.
    Goff, the examiner, noted only a few scattered wheezes
    throughout the lung fields.

. . .  The claimant had some difficulty arising from a
squatting position and he walked with a limp favoring the
right leg.  It is noted, however, that on August 5, 2005, a
psychological examiner observed that the claimant had a
normal gait.

    The claimant has been treated for diabetes.  Early evidence
revealed that his diabetes was not controlled.  But in
February 2005 he was started on insulin.  It was also noted
that the claimant was not eating regular meals. . . .  The
claimant has denied known complications of his diabetes.

    . . .  As a whole, the record does not support the
claimant's allegations.  It was pointed out at the hearing
that the claimant was previously ceased from disability
benefits as he was turned in for building a fence and having
the checks put in his wife's name.  The claimant testified
that it was a mix up caused by a friend's wife.  The
undersigned notes that the record does establish that the
claimant's father owned a fencing company.  Regardless, the
record does establish that the claimant was uncooperative in
consultative examinations which led to the cessation of his
benefits.

    It is noted that no physician or mental health expert has
placed restrictions on the claimant's activities.  It is
also noted that the claimant has not maintained consistent
treatment for his alleged disabling injuries. . . .  [T]he
claimant has not sought work activity consistent with his
alleged limitations or sought retraining.  In fact, a review
of the claimant's earnings record over the past 15 years
revealed consistently low wages which indicates low
motivation to work.

(Tr. at 23-25).

    The record establishes that the ALJ appropriately discussed

the Polaski factors in his opinion.  The ALJ noted that a review

of plaintiff's earnings record over the past 15 years revealed

consistently low wages indicating low motivation to work.  In the

19 years since plaintiff first began working, his highest annual

34

income was $9,280.35 and in his second highest earnings year he made only $5,335.50. His average annual earnings over his lifetime, up through 1998 prior to commencement of his disability benefits, was only $2,468 per year. This factor supports the ALJ's credibility determination.

There is very little evidence of plaintiff's daily activities. When asked during the hearing what he does all day, plaintiff said, "complain." When asked how he passes the time during the day, plaintiff said he does not like to read. Plaintiff refused to answer any questions about his daily activities.

The evidence in the record establishes that plaintiff's symptoms were not as bad as he claimed during the administrative hearing. Dr. Whisman observed "little evidence of depression or anxiety." His maximum ability to sustain concentration and persistence was "adequate in most tasks." Plaintiff told Dr. Hughes that he had no known complications from his diabetes. Plaintiff saw Dr. Smart, his treating physician, sometimes every month but sometimes he went four to five months between visits. Plaintiff's treatment consisted of medication refills.

Plaintiff's treating physician did not restrict his activities. On June 15, 2004, Dr. Smart found full range of motion in plaintiff's knee and all other tests were normal.

35

Aside from recommending physical therapy on February 24, 2005, Dr. Smart treated plaintiff with medication and never placed any physical restrictions on his activities.

On August 5, 2005, Dr. Whisman, who was seeing plaintiff for a mental evaluation, observed the plaintiff had normal gait. Yet when plaintiff saw Dr. Hughes for a physical evaluation, he walked with a limp.

Additionally, plaintiff refused to cooperate with doctors in connection with his disability application. He refused to let Dr. Goff do a rectal exam even though he claimed his enlarged prostate and overactive bladder interfered with his ability to work. He also refused range of motion testing despite his back pain being a significant factor in his alleged disability.

In addition to the above Polaski factors, which the ALJ discussed, I make the following observations with respect to plaintiff's credibility:

■ Plaintiff, in his request for review of hearing decision/ order, claimed that the ALJ was cussing and upset at his staff for losing plaintiff's file. Yet the transcript of the two-minute hearing shows that the ALJ did not use any profanity, did not appear to be angry at all, and repeatedly and politely apologized to plaintiff for having to delay his hearing by a day.

36

- Plaintiff told Dr. Schoenfeld that he was drinking one to two gallons of tea per day and two to three gallons of water per day, yet his urine specific gravity suggested he probably does not drink more than a quart of fluid per day.

- Dr. Goff noted that plaintiff was only partially cooperative with the exam which had been requested by Disability Determinations.

- Plaintiff told Dr. Goff that he had a history of drinking two cases of beer per day, he told Dr. Whisman that he had previously consumed two to three cases of alcohol per day, yet he told Dr. Hughes that he had no history of alcohol use.

- Plaintiff initially refused the Mental Status Exam when he saw Dr. Whisman at the request of Disability Determinations.

- Plaintiff testified that he did not have surgery after his two accidents because "with diabetes, they're afraid to open me up." Yet, plaintiff's injuries occurred in 1980 and the mid 1980's, and he was not diagnosed with diabetes until 2004.

- Plaintiff testified that his doctors tried to take him off his pain medication twice during the year before the hearing but he resumed his heavy use of alcohol. However, the medical records do not indicate that plaintiff was ever taken off his medication. In fact, none of the records establish that his

37

doctor was even concerned about his long-term usage of narcotic
pain medicine or muscle relaxers.

▪ Plaintiff testified that his "whole left leg goes dead", yet
he never made any complaint such as this to his treating
physician.

▪ Plaintiff testified that his glucose is uncontrolled due to
his back pain. However, nothing in the medical records suggests
this is remotely true. Plaintiff's glucose has been essentially
stable, and when it was not stable it was due to his improper
diet.

▪ When plaintiff was confronted with the accusation that he
had been building a fence and had the checks put in his wife's
name, his explanation was that his friend was going through a
divorce and the friend's wife, who was mad at her estranged
husband, turned in plaintiff instead of her husband. That
explanation makes absolutely no sense. Furthermore, the ALJ
pointed out that plaintiff's father owns a fencing company.

▪ Finally, when plaintiff was asked at the hearing if there
was anything he wanted to add about why he could not work, he
said that his family is having a tough time and that the only
income he has is his wife's. This is not relevant to plaintiff's
physical ability to work. Rather, it points out his desire to
have more money without getting a job.

38

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective complaints of disability are not entirely credible.

## VII. RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in finding that plaintiff had the residual functional capacity to perform other work in the economy in part because he found that plaintiff could do "no squatting" which is a confusing term. "All of the other terms used by the ALJ in this RFC have a particular vocational relevance and usage in disability cases. The term 'squatting' is not a commonly used term in vocational parlance. This is self-evident for example in reviewing the Physical Residual Functional Capacity Assessment form used by the government's own medical consultant in this case. Section B of this form, dealing with various postural limitations, does not list 'squatting' as a proper functional category to be assessed." (Plaintiff's brief at p. 14).

The ALJ found that plaintiff retains the residual functional capacity to perform the full range of sedentary work with the following exceptions: lifting no more than ten pounds occasionally and less than ten pounds frequently; perform only work that is simple, routine, repetitive and as stress-free as

39

possible; must have limited contact with co-workers and the general public; must work in a clean environment, relatively free of smoke, dust, and other pollutants; must work in an area of controlled humidity with no extremes of hot or cold; must have a sit/stand option where he can sit every hour for 35 minutes and stand for 25 minutes; may occasionally bend but may do no crawling, kneeling, crouching, or squatting; no climbing of ladders, scaffolds or ropes; and must work only on a smooth level surface on a job with no requirements for foot controls (Tr. at 22).

Plaintiff's argument is that squatting must mean stooping because it is the only ability in Section B of the RFC form used by the Commissioner that was not addressed by the ALJ. This argument is without merit.

"Squat" means "to sit in a low or crouching position with the legs drawn up closely beneath or in front of the body". See Random House Dictionary, 2009. "Stoop" means "to bend the head and shoulders, or the body generally, forward and downward from an erect position: to stoop over a desk." See Random House Dictionary, 2009. SSA's Disability Report Adult defines stoop as follows: "bend down & forward at waist". SSR 85-15 defines stoop as "bend the spine alone". There is essentially no difference between the dictionary definitions of "squat" or

40

"stoop" when compared to the definitions used in the SSA materials, and they are clearly not synonymous. Even in statutory construction, when a word is plain and unambiguous, the courts do not look further for its meaning. <u>Whitfield v. United States</u>, 543 U.S. 209, 215-16 (2005). There simply is no logical reason to assume that the ALJ meant stoop when he said squat. And I have found no legal authority for the proposition that the ALJ is limited to what is printed on a form when evaluating plaintiff's abilities.

Even if the ALJ did mean stoop when he said squat, the jobs he found plaintiff could perform require no stooping. Therefore, plaintiff's argument is without merit.

Plaintiff additionally argues that the ALJ failed to comply with SSR 96-8p which requires the ALJ to provide a narrative discussion describing how the evidence supports each conclusion.

The RFC is a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p. When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments and determine the claimant's RFC. <u>Masterson v. Barnhart</u>, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ must determine the claimant's RFC based on all relevant evidence,

Case 3:08-cv-05017-REL   Document 21   Filed 03/04/09   Page 41 of 44

including medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. Id.

Here, the ALJ discussed the medical records, observations of third parties, and plaintiff's own descriptions of his limitations. Plaintiff's descriptions were found essentially not credible. The RFC assessment is supported by all of the credible evidence in the record, and that is all that is required. Tindell v. Barnhart, 444 F.3d 1002, 1007 (8th Cir. 2006). Therefore, plaintiff's motion for judgment on this basis will be denied.

## VIII. EXHIBIT C7E

Plaintiff next argues that the ALJ erred in adopting the opinion of a Senior Counselor with Disability Determinations rather than considering the medical evidence. This argument is without merit.

Plaintiff claimed to have an overactive bladder. The ALJ discussed the treatment records pertaining to plaintiff's overactive bladder and found that it is not a severe impairment. Plaintiff claimed to have asthma. The ALJ reviewed the medical records pertaining to asthma and determined that there was no objective medical evidence that plaintiff suffered from a medically determinable impairment of asthma. Plaintiff claimed

42

to have sleep apnea. The ALJ reviewed the records pertaining to sleep apnea and determined there was no objective medical evidence that plaintiff suffered from a medically determinable impairment of sleep apnea.

The ALJ reviewed plaintiff's treatment records dealing with his back pain, diabetes, swollen feet, and lower stomach pain. The ALJ discussed the medical records of Dr. Goff, Dr. Smart, Dr. Hughes, and Dr. Whisman. Plaintiff's only treating physician is Dr. Smart who, the ALJ noted, treated plaintiff solely with medication and never limited plaintiff's physical activities. The ALJ considered the MRI of plaintiff's thoracic spine which showed no disc herniation.

The fact that the ALJ also mentioned an RFC assessment by a Senior Counselor does not negate all of the medical evidence he considered. Furthermore, none of the medical records of Drs. Smart, Hughes, Whisman, or Goff contradict the findings in the Senior Counselor's RFC assessment. Therefore, the mere fact that the ALJ mentioned that exhibit multiple times does not mean that he relied solely on that exhibit, when the findings in that exhibit basically mirror the findings of four doctors.

## VII. CONCLUSIONS

Based on the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff

is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is

denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 4, 2009

Case 3:08-cv-05017-REL   Document 21   Filed 03/04/09   Page 44 of 44